JOURNAL ENTRY AND OPINION
Appellant, Robin Aikens, appeals from the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, committing her minor child, Anthony Aikens, to the permanent custody of defendant-appellee, Cuyahoga County Department of Children and Family Services (CCDCFS). For the reasons that follow, we affirm.
Anthony Aikens was born to appellant and Anthony Green on May 27, 1996. Appellant and Green were not married when Anthony was born and Green has never established paternity nor provided any care or support for Anthony.
Appellant was sixteen years of age and committed to the long-term foster care of CCDCFS when Anthony was born. Appellant had been removed from her mother's care years earlier and committed to the legal custody of her grandmother. In 1991, appellant's grandmother requested that the agency resume custody of appellant, however, due to her behavioral problems.
In September 1996, Anthony was adjudicated dependent and committed to the temporary custody of CCDCFS, with placement to appellant in her foster home. In August 1997, Anthony was removed from his placement with appellant, however, after appellant ran away from her foster home with him and disappeared for approximately six months.
In May 1998, CCDCFS filed the first of several complaints alleging Anthony to be neglected and requesting a disposition of permanent custody. The cases were dismissed, however, because service was not obtained on the necessary parties within the statutory time frame.
On July 13, 1999, CCDCFS filed another complaint alleging that Anthony was neglected and requesting a disposition of permanent custody. All parties were properly served and on September 23, 1999, after the complaint was amended, appellant stipulated to the allegations of the amended complaint. The trial court entered an order finding Anthony to be neglected and on November 3, 1999, the matter proceeded to a dispositional hearing.
Danita Taylor, a CCDCFS social worker for appellant and Anthony, testified that CCDCFS had developed a case plan for appellant to enable Anthony to be returned to appellant's custody. Appellant's case plan objectives included obtaining a GED, learning proper parenting skills, maintaining stable employment and housing, learning independent living skills and addressing her mental health problems.
Taylor testified that to facilitate completion of appellant's case plan objectives, CCDCFS and Bellefaire Jewish Children's Bureau (Bellefaire) had provided appellant with numerous support services, including an independent living program through Bellefaire, education on budgeting and job skills, a parenting education program, individual counseling, group therapy, GED training programs and individual tutoring sessions. Taylor testified that as of the date of the permanent custody hearing, appellant had completed the parenting education classes. She had not completed any of the other objectives specified in her case plan, however.
Taylor testified that appellant still had not obtained her GED, even though she had been in four GED assistance programs. Taylor testified that she had arranged for appellant to get individualized tutoring to prepare for her GED test because appellant thought that she was not doing well with the standard GED assistance programs. The twenty-four-week individualized tutoring program consisted of two-hour sessions three days a week. Taylor testified that since the program began on August 31, 1999, however, appellant had missed seventeen sessions, with only one excused absence, and had completed only three make-up sessions.
With respect to appellant's employment situation, Taylor testified that appellant ha[d] no problem getting a job but then would quit each job after two or three weeks because she would find something about it that she did not like and would not stay to try to resolve the situation. According to Taylor, from June 1999 to November 1999, appellant had obtained but subsequently quit four different jobs. At the time of the hearing, appellant was working at her fifth job in six months, but had only been employed at her new job for approximately two weeks.
Taylor testified that she had concerns regarding appellant's budgeting skills because [appellant just does not seem to understand that she has to stay on a budget [and] seems to feel that someone else is going to pick up the bills. For example, Taylor testified that appellant had recently moved into a larger apartment so that she would have more space for her and Anthony. Appellant had purchased, on lay-away, a dresser, headboard, beds, mattresses, bookcases, end tables and coffee tables for the apartment in the amount of $1,100 and then presented the bill to Taylor, expecting Cuyahoga County to pay the bill for the furniture. Taylor also testified that appellant had received the money for a deposit on the apartment from a family friend, rather than budgeting and saving for the deposit.
With respect to appellant's emotional problems, Taylor testified that appellant had been undergoing counseling to address her anger issues and her depression for the majority of the time she was in custody of the county. According to Taylor, appellant's therapists had often recommended medication for her depression, but appellant had refused to comply with their recommendations, although appellant had recently stated that she was now willing to take medication. In January 1999, appellant began receiving counseling from Northeast Ohio Health Services. Appellant did not cooperate with her counselor, however, and stayed with the program only four months. In June or July 1999, she began attending counseling sessions at Rapart Center for Families and Children. Appellant's therapist at Rapart described appellant as depressed, sullen, and overwhelmed, and recommended that appellant be treated with medication by a psychiatrist for depression.
Taylor testified that Anthony had been in his current foster home for approximately two years and was doing well there. According to Taylor, Anthony was very affectionate with his foster parents, who wanted to adopt him.
Taylor testified that she had made arrangements for appellant to visit Anthony while he was in foster care. Initially, Anthony was brought to appellant's home for the visits, but often appellant was not there or would arrive late for the visit. Taylor then arranged for visitation to occur every other week at the Metzenbaum Center for Children. Taylor testified that appellant was very late for two of the three visits that occurred at the Metzenbaum Center prior to the hearing. According to Taylor, on the morning of the initial visit at the Metzenbaum Center, she called appellant at 10:30 a.m. to ask her if she was coming to the 11:00 visit. Appellant assured her that she would be there, but then did not arrive until 1:15 p.m., with no excuse as to why she was late. Appellant was also more than one hour late for the second meeting.
Taylor testified that appellant's overall inconsistency with anything she d[id] caused her concern regarding appellant's ability to parent Anthony. Taylor testified, she doesn't consistently go to her GED classes. She doesn't consistently go to her tutoring classes. Her jobs, none of those have been consistent. Taylor testified that appellant's inability to consistently care for herself made her doubt appellant's ability to adequately care for Anthony.
Taylor testified that although appellant loved Anthony and was good with him when she visited him, she just simply does not understand what it takes to take care of a child. According to Taylor, appellant was aware that the monetary support provided by the county agencies was going to end soon, but had not made any preparations for that eventuality. Taylor testified that in her most recent meeting with appellant in October 1999, appellant had informed her that her plans for the future were to obtain SSI so she would not have to work. She had no future plans.
Dawn Schippling, appellant's case manager at Bellefaire, testified that appellant had entered Bellefaire's independent living program in September 1998. Schippling testified that she had concerns regarding appellant's ability to take care of herself because of her inability to keep a job and her emotional instability. According to Schippling, although appellant was able to find jobs, she usually quit each job shortly after she had started because she found something about the situation that she did not like. Schippling testified that appellant had held six to eight jobs since she started the program at Bellefaire.
Schippling noted that appellant was not able to ever stay with one thing. According to Schippling, appellant would be very motivated to work toward attaining her case plan objectives when a court date was approaching but would lose her motivation shortly after the hearing and then not follow through.
Harvey Massengale, a chemical dependency counselor, testified for appellant. Massengale testified that he had seen appellant three times in August and September 1999 for a chemical dependency assessment and concluded that appellant did not have a problem with drugs or alcohol.
Appellant's father, Jerry Lee Saffo, Jr., also testified for appellant. Saffo testified that he had lost contact with appellant when she was nine years old and had reestablished contact with her only two months prior to the hearing, when appellant found him through a mutual friend. According to Saffo, appellant's mother and maternal relatives had refused to tell him appellant's whereabouts although he had tried several times to locate her. Saffo testified that he never married appellant's mother and never established paternity of appellant.
Saffo testified that he was employed full-time at Cleveland Industrial Drum. He testified further that he lived in a one-bedroom apartment with his mother, who is disabled, but would be willing to relocate to a larger apartment so that appellant and Anthony could live with him and his mother. According to Saffo, his mother, whom he admitted had never met Anthony, could watch Anthony while he was at work. Saffo admitted that he, too, had never met or visited Anthony.
On January 4, 2000, the trial court entered an order committing Anthony to the permanent custody of CCDCFS.
Appellant timely appealed, raising one assignment of error for our review:
 I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY SINCE (1) NONE OF THE CIRCUMSTANCES SET FORTH IN R.C. 2151.414 WERE PROVEN BY CLEAR AND CONVINCING EVIDENCE AND (2) THE JUDGMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The termination of parental rights in a natural child, when the child is neither abandoned nor orphaned, is governed by R.C. 2151.414(B), which provides that a court may grant permanent custody of a child to the agency if the court determines, by clear and convincing evidence,[1] that 1) it is in the best interest of the child to grant permanent custody of the child to the agency; and 2) the child cannot be placed with either of his parents within a reasonable period of time or the child should not be placed with his parents.
R.C. 2151.414(E) sets forth guidelines for determining whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents:
 In determining * * * whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with either parent.
The statute then lists various factors for the court to consider, including:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *
Once the trial court finds from all relevant evidence that one of the factors exists and the child cannot or should not be placed with either of his parents, it then must consider whether permanent custody is in the best interest of the child. In re William S. (1996), 75 Ohio St.3d 95,99. In determining whether permanent custody is in the best interest of a child, R.C. 2151.414(D) requires the juvenile court judge to consider all relevant factors, including, but not limited to:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (5) Whether any of the factors in division (E)(7) to (11) of [R.C. 2151.414(E)] apply in relation to the parents and child.
It is axiomatic that both the best interest determination and the determination that the child cannot be placed with either parent focus on the child, not the parent. In re Awkal (1994), 95 Ohio App.3d 309, 315. As this court stated in In re Awkal, supra:
 R.C. 2151.414(D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interest of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. * * * Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. Id. at 316. (Citations omitted.)
Appellant asserts that the trial court erred in granting permanent custody of Anthony to CCDCFS because none of the factors set forth in R.C. 2151.414(E) was proven by clear and convincing evidence and the judgment was against the manifest weight of the evidence. We disagree.
In its order granting permanent custody to CCDCFS, the trial court found that Anthony could not or should not be placed with appellant because following the placement of the child outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside the home. See R.C. 2151.414(E)(1). The record supports the trial court's finding.
Anthony had been removed from his placement with appellant in August 1997 after she ran away from her foster home with Anthony and disappeared for approximately six months. CCDCFS developed a case plan for appellant to enable Anthony to be returned to appellant's custody. Appellant's case plan objectives included obtaining a GED, learning proper parenting skills, maintaining stable employment and housing, learning independent living skills and addressing her emotional health issues.
According to Danita Taylor, appellant's social worker, CCDCFS and Bellefaire had provided appellant with numerous support services to assist her in meeting these objectives. At the time of the hearing, however, more than two years after Anthony had been removed from his placement with appellant, appellant had completed only one of the objectives of her case plan, i.e., the parenting classes.
Appellant had not obtained her GED, even though she had been in four GED assistance programs. Moreover, although Taylor had arranged for appellant to receive individualized tutoring assistance to prepare her to take the GED test, appellant repeatedly failed to attend the tutoring sessions. At the time of the hearing, appellant had not taken the GED test and had given no indication to anyone that she would be taking it in the foreseeable future.
Appellant had also failed to maintain stable employment. In the six months prior to the hearing, appellant had worked at four different jobs. At the time of the hearing, appellant was working at her fifth job in six months, but had been employed there for only two weeks. In light of her employment history, however, it was unlikely that she would remain at the job for any significant period of time. According to both Taylor and Schippling, appellant would consistently find something about each job that she did not like and then leave the job, rather than staying and trying to work out the problem. Moreover, Taylor testified that appellant's most recent plan was to obtain SSI and not work at all, relying upon others to provide for her financially.
The evidence adduced at the hearing also established that appellant had failed to adequately learn independent living skills, another objective of her case plan. For example, when appellant moved to a larger apartment in order to have more room for her and Anthony, she put $1,100 worth of furniture on lay-away and then presented the bill to Taylor, expecting Cuyahoga County to pay the bill. Furthermore, appellant relied upon a family friend to pay the deposit on the apartment, rather than saving her money for the deposit. Moreover, as Taylor testified, even though appellant was well aware that the monetary support provided by the county agencies was going to end soon, she had made no preparations for that eventuality. According to Taylor, appellant just expected someone else to pay her bills.
Appellant's pattern of missing or showing up late for her visits with Anthony were also evidence that she had not adequately learned independent living skills. Taylor testified that even though Anthony was initially taken to appellant's home for visits, the arrangement had to be changed due to appellant's chronic absence or tardiness for the visits. When the visits were subsequently moved to the Metzenbaum Center, appellant continued to arrive late for the visits, once arriving more than two hours late, even after assuring Taylor that she would be there, without any explanation as to why she was late.
The evidence also established that appellant had failed to adequately address her emotional and mental health problems. Although appellant had been advised to take medication for her depression, she had refused to take it. Subsequently, after only four months of attendance, she had stopped attending the counseling sessions to which she had been referred. She also stopped attending group therapy sessions because she did not like the group leader. At the time of the hearing, appellant's therapist described her as sullen, overwhelmed and depressed and had recommended that appellant take medication to treat her depression. Accordingly, it was apparent that despite the numerous support services provided to her, appellant continued to suffer from emotional and mental health problems.
Appellant claims that it is understandable that she would have some mental health issues given her background and that her willingness to now take medication to treat her mental health problems demonstrates her maturity in dealing with this problem. We acknowledge that Taylor testified that appellant had stated that she was now interested in taking medication to treat her depression. Schippling testified, however, that appellant was often motivated to work toward achieving her case plan objectives when a court date was approaching, but would then lose her motivation and not follow through after the hearing. Thus, appellant's claim that she was now ready to address her mental health problems is doubtful.
In short, the evidence adduced at the permanent custody hearing clearly and convincingly established that appellant had continuously and repeatedly failed to substantially remedy the conditions that led to Anthony's removal from her custody. Accordingly, the trial court did not abuse its discretion in finding that Anthony could not or should not be placed with appellant.
The trial court also did not err in finding that awarding permanent custody of Anthony to CCDCFS was in Anthony's best interest. Taylor testified that Anthony had been in his current foster home for over two years, was doing well there and was very affectionate with his foster parents, who wanted to adopt him. Moreover, Anthony's guardian ad litem recommended that permanent custody be granted to CCDCFS. Accordingly, the trial court did not abuse its discretion in finding, pursuant to the factors identified in R.C. 2151.414(D), that permanent custody was in Anthony's best interest.
Appellant's assignment of error is overruled.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Juvenile Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 __________________________ TIMOTHY E. McMONAGLE, P.J.
[1] Clear and convincing evidence is defined as [t]hat measure or degree of proof which is more than a mere `preponderance of evidence' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. Lansdowne v. Beacon Journal Publishing Co. (1987),32 Ohio St.3d 176, 180-181.